GENERAL COOPERAGE & TIMBER COMPANY *v.* HEDGES.

Opinion delivered December 22, 1919.

1. SALES—EXECUTORY CONTRACT—RIGHT OF INSPECTION.—Where a contract for the sale of staves was an executory one, the defendants had the right to inspect them in order to ascertain whether they conformed to the agreement.

2. SALES—PLACE OF INSPECTION.—In an action for breach of a contract of sale of staves in which the purchasers had a right of inspection, preponderance of evidence *held* to support finding of chancellor that the agreement was that the staves should be inspected at the place of manufacture, and not at the place of delivery.

3. RECEIVERS — DAMAGES BY APPOINTMENT.—Where the evidence shows that the receiver never actually took the property out of the owner's possession, but permitted him to continue to operate it just as he had done before, the owner suffered no loss by the appointment, and the chancellor was correct in not allowing damages on account thereof.

Appeal from Ashley Chancery Court; *E. G. Hammock,* Chancellor; affirmed.

STATEMENT OF FACTS.

The General Cooperage & Timber Company and H B. Carter brought this suit in equity against Z. T. Hedges and G. W. Moore to recover an amount alleged to be due them under a contract for the sale of certain staves. They alleged in their complaint that the defendants were insolvent, and asked for the appointment of a receiver to take charge of the defendants' stave mill and a large

quantity of staves on hand in it which are alleged to belong to the appellants.  A receiver was duly appointed and took charge of the property.  The appellees denied that they were indebted to the appellants, and by way of a cross-complaint allege that the appellants were indebted to them, and they also ask for damages which accrued by reason of the appointment of a receiver.

The original contract between the parties was duly signed by them and reads as follows:  "This memorandum of agreement made and entered into this............day of October, 1913, by and between Z. T. Hedges and George W. Moore of Pulaski County, Arkansas, parties of the first part, and the General Cooperage & Timber Company of New Orleans, La., party of the second part.

"Witnesseth:  That for and in consideration of the sum of one dollar in hand, paid by the party of the second part to the parties of the first part, the receipt of which is hereby acknowledged, the parties of the first part do hereby sell to the party of the second part and the party of the second part hereby buys from the parties of the first part, the following staves, towit:  200,000 34 in. x ¾ in. air dried and listed white oak whiskey staves at the price of $42 per 1,000 on basis of 4½ in. average, f. o. b. cars Wilmot, Arkansas.

"100,000 34 in. x, ¾ in. air dried and listed white oak barrel staves at the price of $20 per 1,000 on basis of 4½ in. average, f. o. b. cars Wilmot, Arkansas.

"100,000 staves, width may be either 34 in. x ¾ in. air dried and listed red oak at $19 per 1,000 on basis of 4½ in. average, f. o. b. cars Wilmot, Arkansas, or 30 in. x ⅝ in. ash pork staves, air dried and listed at $14 per 1,000 on basis of 4¼ in. average, f. o. b. cars Wilmot, Arkansas, or parties of the first part may deliver part red oak and part ash so that the total number of such staves delivered will not exceed 100,000.

"Inspectors shall be governed by the standard rules agreed to by the Tight Barrel Stave Manufacturers' Association and the National Coopers' Association.

"Party of the second part agrees to advance the parties of the first part the sum of $1,000 cash. Said $1,000 to be used in the purchase and installation of a country stave mill, and, upon the purchase of said plant, the said first parties hereby agree to give to the said second party a mortgage covering the said stave mill outfit as a further protection of their note for $1,000 payable at four months from date and bearing interest at the rate of 6 per cent. per annum, which first parties agree to furnish upon the signing of this contract and before said sum of $1,000 is advanced to said first parties.

"The second party also agrees to advance to the first parties the sum of $17.50 per 1,000 on the white oak staves above purchased, $15 per 1,000 on the red oak and $11 per 1,000 on ash, as they may be delivered to the railroad at Wilmot, Ashley County, Arkansas, when due as many as 50,000 have been so delivered. The object being that the second party shall make advances only upon lots of 50,000 or more.

"Second parties agree that upon the signing of this contract by the parties of the first part to furnish the sum of $1,000 by their check mailed from their office in New Orleans promptly upon receipt by them of this contract properly executed.

"It is understood that the difference between the amount advanced as the staves are delivered to the railroad and the contract prices shall be credited upon the note of $1,000, which second party agrees to cash under the terms of this contract.

"It is understood and agreed by the parties hereto that the manufacture of staves herein contracted will begin as soon as possible and full delivery made not later than June 1, 1914.

"It is also agreed between both parties that no other staves shall be sold to or manufactured for any party by said first parties until this contract is completed and all obligation hereunder canceled.

"This contract is executed in triplicate.

"Witness the signatures and seals of the parties hereto this 15th day of October, 1913."

The General Cooperage & Timber Company advanced $1,000 to G. W. Moore on the 15th day of October, 1913, and G. W. Moore and Z. T. Hedges gave their written obligation in payment therefor and agreed to give the General Cooperage & Timber Company a mortgage on the mill plant as security for the note. On the 15th day of October, 1913, G. W. Moore and Z. T. Hedges entered into a lease contract with H. B. Carter, which is as follows:

"Memorandum of agreement to the lease between Hedges & Moore, of Wilmot, Arkansas, as lessors, and H. B. Carter of New Orleans, La., as lessee, entered into this 25th day of May, 1914.

"The said lessors hereby lease and demise to said lessee the following described premises for and in consideration of the sum of $1 cash in hand paid to the lessors by the lessee, the receipt of which is hereby acknowledged.

"Five acres, more or less, located in the tract of land belonging to A. M. Kellar, west of railroad in the town of Wilmot, Arkansas, the said five acres being located on the west end of said tract on lake bank and west of small ravine running to lake.

"Tract above described is more specifically set forth in lease from Maingault & Gorham to G. W. Moore, dated November 5, 1913, to which reference is here made.

"It is agreed between the lessors and the lessee that this lease shall remain in effect and full force as long as any staves are piled on the herein described land on which moneys are advanced, under terms of a certain contract, entered into between Hedges & Moore and the General Cooperage Company under date of October 15, 1913."

H. B. Carter by assignment succeeded to the rights of the General Cooperage & Timber Company in the original contract. The court found that all the staves involved in the controversy between the parties were, by the terms of sale, to be delivered, inspected and accepted

by appellants on the railroad at Wilmot, Ashley County, Arkansas, and that the items recharged to the defendants on account of the inspection and rejection of the staves at New Orleans, their point of destination, were not legitimate charges, and the defendants' exceptions thereto should be sustained.

The court found that the total charges against the appellees should aggregate $10,763.70, and that the total credits to which appellees are entitled aggregate $12,-446.55, leaving appellants indebted to appellees in the sum of $1,682.85. The court further found that the receivership and injunction obtained by the appellants at the beginning of this suit were wrongfully obtained, but that appellees had not been damaged thereby. It was therefore decreed that appellee G. W. Moore should recover of the appellants the sum of $1,682.85 with interest at the rate of 6 per cent. per annum from August 11, 1915, until paid.

To reverse the decree, appellants have prosecuted this appeal, and appellees have taken a cross-appeal.

*G. P. George* and *Geo. W. Hays,* for appellant; *Gardner K. Oliphint,* on the brief.

1. The decree is clearly against the preponderance of the evidence; it is shocking to the sense of justice. The contract is incomplete as to the exact place of inspection of the staves, and hence the parties resorted to parol evidence to prove the real intention of the parties where inspection was to be made. The testimony shows that the inspection was to be made on arrival at point of destination, New Orleans, and the law so fixes the destination as the point of inspection. The evidence on that point is definite and competent. 135 Ark. 31. The balance due on the staves was to be paid after inspection, whether at Wilmot or New Orleans, according to the rules of the Tight Barrel Stave Manufacturers' Association, etc. The chancellor erred in finding that the inspection was to be made on the railroad at Wilmot and the staves accepted there.

"F. O. B." means "free on board;" used in the sale of goods, it only denotes the duty of the seller to deliver the goods free from all charges on board the carrier. This is all it denotes. 81 N. E. 1017; 23 R. C. L., sec 159, p. 1337.

2. There was no actual inspection at Wilmot, as the testimony shows at most a count of the number. Mr. Moore's visits strongly indicate that the inspection was to be at New Orleans. 46 Ark. 131.

3. The chancellor should have debited appellee's account with $4,125.16 for staves rejected because not up to contract, and the testimony for appellant and of H. B. Carter is sufficient to base judgment for the rejected staves. The law applicable can be found in 101 Pac. 233; 136 Ark. 342; 76 *Id.* 177-179; 35 Cyc., pp. 384-386, 391-7, 403. See also 81 Ark. 549. The contract was not an entire contract, and appellants are entitled to the charges for failure of the staves to come up to standards and specifications as to quality and character. The contract entitled appellant to inspect separately each and every car load shipped as to character and quality to determine the amount of credit appellees were entitled to on each car. 81 Ark. 559-560.

4. The contract was not entire, but, if so, under the evidence and law (*supra*), appellant is entitled to charge appellees for the deficiency in character and quality of the staves. 93 Ark. 454; 125 S. W. 122; 27 L. R. A. (N. S.) 914-919.

5. The contract was an executory one, and appellant had the right to inspect after arrival at New Orleans and to charge appellees back with the amount of all staves found to fail to come up to specifications and standards. 93 Ark. 454. There was no completed sale merely upon delivery to the carrier. L. R. 7 C. P. 438. Though title may have passed to the purchaser if he has had no opportunity of inspection he has the right to inspect within reasonable time and may reject the articles if they do not comply with the warranty of quality or other terms of the contract, as the sale or contract is ex-

ecutory only. 106 N. W. 891; 58 *Id.* 373; 29 Pac. 6. No inspection was made or contemplated to be made at Wilmot, but it was to be at destination, New Orleans. On question of delivery, see 209 S. W. 65; 100 Ark. 17; 23 R. C. L. 1426, secs. 250 and 256, p. 1432; 115 U. S. 363; 2 Mechem on Sales, § 1377; Williston on Sales, § 473; 12 Am. St. 831; 22 N. E. 349.

6. As to the miscellaneous items, McQuay's expenses to Wilmot, etc., they should have been allowed. The decree should be reversed and judgment entered here for $2,980.97.

*Compere & Compere,* for appellee Moore.

1. Under the contract the place of inspection was Wilmot, and inspections at another place did not bind Moore. The parol agreement establishes this fact and the evidence was competent.

2. As to miscellaneous items, the lower court properly refused to charge appellees with them.

*Williamson & Williamson,* for appellee Hedges.

1. There was no partnership between Moore and Hedges. The evidence and documents show this conclusively.

2. The court properly found that the place of inspection was Wilmot, and the evidence sustains the finding.

3. The book accounts and exhibits and cash payments show an acceptance of the staves at Wilmot.

The law cited by appellant is undoubted, but no law is involved in this case, only a question of fact. The evidence proves conclusively an acceptance at Wilmot many months before any question was raised. 76 Ark. 177-9.

4. Appellants not only had full opportunity of inspection, but did actually inspect and did not undertake to repudiate within a reasonable time. 62 L. R. A. 795.

5. There was no error as to the miscellaneous items, but the court erred in not allowing damages from the wrongful issuance of the injunction and the receivership;

$1,000 at least was proved, which should have been al-lowed on cross-complaint.

HART, J., (after stating the facts). The parties to this lawsuit entered into a written contract whereby appellees agreed to sell the white oak, red oak and ash staves which they should manufacture at their stave mill at Wilmot, Ark., to appellants for a stipulated price per thousand f. o. b. cars, Wilmot, Ark.

The contract provides that the inspectors shall be governed by certain designated standard rules, but the contract is silent as to the place of inspection. Appellants agreed to advance appellees $1,000 for the purpose of purchasing a stave mill and appellees agreed to give appellants a mortgage on the mill. The contract further provides that appellants shall advance appellees a stipulated sum per thousand on the staves as they may be delivered to the railroad at Wilmot, Ark., when as many as 50,000 have been delivered; but that no advances shall be made on lots less than 50,000. The difference between the amounts advanced and the contract price was to be credited on the $1,000 note. The manufacture was to begin at once and full delivery made before June 1, 1914. The date of the contract was October 15, 1913. Under this contract appellants claim that the sum of $14,484.40 was advanced to appellees, and that appellees delivered staves of the contract value of $11,503.43, leaving a balance due to appellants of $2,980.97. On the other hand, appellees claim that appellants advanced to them only the sum of $10,246.36, and that they delivered to appellants staves of the contract value of $12,446.55, leaving a balance due appellees by appellants $2,200.20; for which judgment is prayed in the cross-complaint.

The chancellor found that the amount advanced to appellees was $10,763.70; and that the value of the staves shipped under the contract was $12,446.55, leaving a balance due appellees of $1,682.85; and a decree was entered accordingly. The finding of the chancellor was based on a holding that there was an understanding between the

parties that all the staves were to be delivered, inspected and accepted by appellants on the railroad at Wilmot, Ark.

There are some miscellaneous items to be taken into consideration in stating an account between the parties, but it is admitted by counsel on both sides that the correctness of the chancellor's finding in the main depends upon whether or not the inspection should have been made at the point of shipment, or at the place of destination. If the inspection ought to have been made at Wilmot, Ark., the appellants accepted the staves there and could not afterwards make any charges against appellees on account of defects in the staves, which were discovered by a subsequent inspection made after the staves reached the point of destination. On the other hand, if the staves were not to be inspected until they arrived at New Orleans, the point of destination, the evidence of appellants shows that when inspected there they were found to be defective, and that, after throwing out the culls, appellants were only liable to appellees in the amount stated above, which was less than the amount advanced to appellees by appellants.

It is conceded by counsel on both sides that, the contract for the sale of the staves being an executory one, appellants had the right to inspect the staves in order to ascertain whether they were such as the appellees had agreed to ship them, and such is the law. *Deutsch* v *Dunham,* 72 Ark. 141, and *Ward Furniture Man. Co.* v. *Isbell,* 81 Ark. 549.

The written contract contains a provision that the inspector shall be governed by certain designated standard rules; but is silent as to the place where the inspection is to be made. In the case at bar, however, both parties testify that a separate oral agreement was made as to the place where the inspection was to be made; but their testimony is in irreconcilable conflict as to the terms of that agreement. Thomas Sanders represented appellants in the matter, and was asked if anything was said by appellees about inspecting the staves at Wilmot, Ark.

He answered: "No; on the contrary, it was distinctly understood that the staves were not to be inspected and graded at Wilmot, Arkansas, but were to be inspected and graded at points of destination, that is, at points where the staves were to be shipped. That is why Hedges & Moore provided for advances to be made by Mr. Carter on the staves. It was understood that the staves were to be examined as to quantity or number at Wilmot, Arkansas; that advances of part of the purchase price were then to be made as soon as the staves were delivered to the railroad, and the balance of the purchase price was to be paid after the staves had arrived at destination and had been inspected and graded. If it had been agreed upon or understood that the staves were to be inspected and graded at Wilmot, Arkansas, then there would have been no provision or agreement about advances when delivered to the railroad at Wilmot, Arkansas; for, if the staves were to be inspected and graded at Wilmot, Arkansas, before delivery to the railroad, then the purchase price of the staves would have been due and payable and the question of advances would not have arisen."

In addition it was shown by appellants that they had sold the staves to the Brooklyn Cooperage Company at New Orleans, and had directed appellees to ship the staves to the company; that on on one occasion appellee G. W. Moore had been summoned to New Orleans on account of the inspector of the consignee finding so many defective staves; that the staves were then reinspected in the presence of both H. B. Carter and G. W. Moore, and that Moore had expressed himself as satisfied with the inspection.

On the other hand, G. W. Moore denies this. He admitted that he went to New Orleans, but his version of what occurred between him and Carter after arriving there is that he never expressed himself as being satisfied with any inspections there. He said he went to the factory where Carter said the staves were, and that Carter tried to show him the culls; that he asked Carter where the good staves were and that Carter answered that they

were in the dry kiln; that he turned to Carter and asked him how he figured on him, Moore, inspecting staves in the dry kiln; that he then told Carter that he had not sold him finished staves, but rough ones; that there was no use to look any further; and that he looked to Carter to pay for all the staves that had been shipped under the contract; that the representative of the consignee asked him why he did not sell direct to a factory like itself, instead of selling to a middle man like Carter; that he could make more money by doing so. Moore further testified that the agreement was that the inspection was to be made at Wilmot, Ark., and that appellants sent a man there every time he, Moore, drew a draft on them, and that the representative of appellants came and inspected and counted the staves at Wilmot, Ark.; that Mr. McQuay, Mr. Carter's son and Mr. Baxter, who stayed at Wilmot about three months, were the representatives of appellants sent to Wilmot from time to time to inspect the staves; that Baxter made a report to appellants on every car and did his own inspecting and culling; that Baxter accepted the staves shipped and so reported to appellants.

Mr. McQuay testified for appellants that he was sent there once or twice to count the staves ready for shipment; but said that he had no directions with regard to inspecting them for quality and did not do so. Neither Carter's son nor Baxter were called as witnesses nor was any attempt made to explain their not being called to testify.

Z. T. Hedges also testified in positive terms that the contract was that the inspection was to be made at Wilmot, Ark. He said that he owned the timber out of which the staves were to be manufactured and expected to get his pay therefor out of the staves which Moore would ship to appellants; that for this reason he was interested in the inspection being made at Wilmot and was not willing to wait until the staves arrived at New Orleans.

It was shown that twenty-three car loads were shipped, and that the staves run all the way from 15,000

to 19,000 staves to the car load. The staves were hauled to Wilmot and deposited on the five-acre lease preparatory to inspection and shipment according to the testimony of appellees. They also stated that many culls were there after the shipment of staves was stopped.

The record shows that from time to time a bill of sale to the staves then deposited on the five-acre lease at Wilmot was made by appellees to appellants. Under this state of the record, it can not be said that the finding of the chancellor that the parties agreed that the inspection should be made at Wilmot is against the preponderance of the evidence. The testimony of the parties to the agreement on this point is in direct conflict.

Moore and Hedges testify that the agreement was that the inspection should be made at Wilmot, and that pursuant to the agreement appellants sent Mr. McQuay, Mr. Baxter and H. B. Carter's son to Wilmot, and that they inspected the staves, took out the culls and accepted the staves for appellants every time Moore drew on them for the purchase price of the staves.

Counsel for appellants point to the fact that McQuay testified that he was only sent there to inspect for quantity and that he did not inspect for quality. Of course, this tended to contradict the testimony of Moore, but, on the other hand, neither Carter's son nor Baxter who did the greater part of the inspecting testified in the case, and no explanation is made as to why they were not called as witnesses relative to so vital a matter.

Again it is said that Moore is contradicted by Carter and the representative of the factory to whom Carter had sold the staves in New Orleans. They both testified that Moore expressed himself as satisfied with the inspection made there. Moore denied this, and said he told Carter that he expected to hold him to the inspection made at Wilmot. The fact that a lot of culls were left on the five-acre tract of ground which appellants had leased at Wilmot for the purpose of having the staves deposited preparatory to shipment tended to corroborate Moore. The parties knew approximately how many staves a car would

hold, and if quantity was all the inspection at Wilmot was to be made for, it seems that it was a vain and useless thing to do; for the bill of lading would show approximately the number of staves and this could accompany the draft drawn by Moore on appellants for the purchase price of the staves. Then, too, several bills of sale were executed by appellees to appellants from time to time to staves piled on the five-acre lease. This indicated that these staves had been accepted by appellants. After a careful consideration of the testimony from its different angles, we can not say that the finding of the chancellor with regard to the point of inspection is against the preponderance of the evidence.

There were four items which are referred to as miscellaneous items, and one of these is for $400. Moore testified positively that he did not get this money. Appellants undertook to set out all the checks and drafts that they had paid in favor of Moore for staves. This one was not among them, and the chancellor was right in not allowing it. The other three items are small ones, and we do not think it can be said that the finding of the chancellor with regard to them is against the preponderance of the evidence. We do not regard them of sufficient importance to merit a separate and detailed discussion.

Upon the cross-complaint but little need be said. It is true Moore testified that he was solvent at the time the receiver was appointed, and has continued solvent since that time. But the evidence also shows that the receiver never actually took the property out of Moore's possession, and permitted him to continue to manage and operate it just as he had done before. Hence the appellees have not suffered any loss by the appointment of the receiver, and the chancellor was right in not allowing them any damages on account thereof.

Therefore the decree will in all things be affirmed.